**DOROTHY EDWARDS REALTORS, INC., First Federal Savings & Loan Association of Kokomo, Appellants (Defendants),**

v.

**Walter I. McADAMS, Margie L. McAdams, Appellees (Plaintiffs).**

No. 34A02–8609–CV–00320.

Court of Appeals of Indiana, Second District.

July 11, 1988.

J. Conrad Maugans, Bayliff, Harrigan, Cord & Maugans, P.C., Kokomo, for appellant Dorothy Edwards Realtors, Inc.

Thomas J. Simmons, Simmons & Fleming, Kokomo, for appellant First Federal Sav. & Loan Ass'n of Kokomo.

Joseph H. Davis, Lawrence R. Murrell, Davis & Murrell Law Firm, Kokomo, for appellees.

BUCHANAN, Judge.

Dorothy Edwards Realtors, Inc. (Edwards Realtors) and First Federal Savings & Loan Association of Kokomo (First Federal) appeal the trial court's judgment in favor of Walter I. McAdams (Walter) and Margie L. McAdams [hereinafter collectively referred to as the McAdamses], claiming that the statute of limitations barred the McAdamses' claim, that the trial court's findings and conclusions were contrary to the law and to the evidence, that the trial court erred in finding that First Federal violated various consumer credit laws and awarding attorneys fees based thereon, and that the trial court should have allowed First Federal foreclosure on the mortgage.

We reverse.

## FACTS

On September 29, 1975, Donald L. Parnell and Loretta M. Parnell [hereinafter referred to as the Parnells] borrowed $31,000 from First Federal, a sum secured by a note and recorded mortgage on their residential real estate [hereinafter referred to as the property]. According to the mortgage, if the property was sold by the Par-

nells without First Federal's written consent, First Federal had the option to declare the Note immediately due and payable.

On November 28, 1980, the Parnells entered into an exclusive agreement with Edwards Realtors to sell the property. Gary Taylor (Taylor) was the principal owner of Edwards Realtors and the Parnells' real estate agent.

The Parnells and the McAdamses, through Taylor, entered into a purchase agreement on June 12, 1981, which provided for the sale of the property to the McAdamses by land sale contract, with the purchase price being $72,500. The down payment was set at $40,000, with the balance of $32,500 to be paid in minimum monthly installments of $500. The purchase agreement provided that "[t]itle shall be subject to easements, and restrictions of record, if any, and free and clear of all other liens and encumbrances except as herein stated." *Record* at 34. The mortgage lien held by First Federal was not mentioned.

On or before June 23, 1981, Taylor gave to Robert Heltzel, First Federal's vice-president, a copy of the purchase agreement and a proposed land sale contract. First Federal orally agreed to the sale, and then chose not to declare the unpaid balance due and payable.

After Taylor delivered an abstract of title to the property to the McAdamses' attorney, Joseph Davis (Davis), Davis returned to Taylor a title opinion on June 23, 1981. Davis found merchantable title in the Parnells and specifically referred in the title opinion to two mortgage liens on the property, one of which was the lien held by First Federal. Davis concluded in his opinion that the lien held by First Federal should be satisfied and released at closing. The McAdamses did not receive a copy of the opinion.

At the closing on June 24, 1981, a land sale contract prepared by Taylor was signed by the parties. The McAdamses made a $40,079.68 down payment to Taylor, which Taylor placed in the Edwards Realtors' trust account. This contract provided that "[t]he Seller may, at his election, place or maintain a mortgage on said premises for an amount not in excess of the then unpaid balance of the sale price; and the Buyer agrees that any such mortgage shall be a first lien and prior to any interest of his in said premises. . . ." *Record* at 43. Neither the McAdamses' attorney nor their real estate agent was present at closing. Although Taylor was aware that First Federal's mortgage should be released at closing, he did not so advise the McAdamses before the closing was consummated. The fact that the mortgage would remain on the property after closing was not discussed with Walter at any time. However, Walter was indirectly aware of that because he heard the Parnells remark at closing they would pay $10,000 to First Federal on their obligation. He also knew that the approximate amount of the mortgage was $31,000. A copy of the recorded land sale contract was delivered to First Federal on June 25, 1981.

From the down payment received at closing from the McAdamses and placed in the trust account, Taylor paid $6,000 to Household Finance and thereby satisfied Houshold's lien on the property. None of the money received by Taylor at closing was applied to extinguish or reduce the debt secured by the mortgage held by First Federal.

On June 25, 1981, the Parnells paid First Federal $10,000 on their debt. On June 29, 1981, the Parnells and First Federal entered a modification agreement, which provided for the payment of the remaining indebtedness (approximately $20,000) owed on the Parnells' debt. The interest rate was raised to 16%, with the first of monthly payments of approximately $400 due in July, 1981. The Parnells, however, did not make any payments under this agreement until April, 1983. First Federal made no disclosures to either the Parnells or the McAdamses of any deferrals it was making of the Parnells' required payments, although each month that the Parnells did not pay, First Federal capitalized the interest and added it to the outstanding balance.

The McAdamses, on the other hand, made all of their regular monthly payments of $500 to the Parnells under the land sale contract. *Record* at 323, 433–34. Sometime prior to May 7, 1983, Walter was ready to pay the balance on the land sale contract, but was "troubled" about the balance of the Parnells' debt. *Record* at 318, 320. Inquiries to the Parnells and First Federal as to the amount of the unpaid balance on the loan were unavailing. *Record* at 320–21, 397. An agent of First Federal did inform Walter that the Parnells were current on their payments. *Record* at 321, 396. It was not until February, 1984, that the McAdamses first learned that the balance on the mortgage exceeded the balance due on the contract and that the Parnells had not been making payments on the debt secured by the mortgage. *Record* at 321–22, 326. After learning this, the McAdamses made no further payments under the land sale contract. *Record* at 323. The unpaid contract balance at that time was $5,253.97. *Record* at 324.

First Federal declared the Parnells in default in July, 1984. On October 2, 1984, the McAdamses brought suit against the Parnells, Edwards Realtors, and First Federal. The McAdamses asked that the Parnells be ordered to convey the property to them free of all liens and encumbrances. Against Edwards Realtors, the McAdamses alleged that Taylor failed to pay First Federal the money received from the McAdamses at closing to satisfy the lien, and asked for a judgment against Edwards Realtors to pay the remaining debt on the mortgage lien, and for attorney fees. Against First Federal, the McAdamses charged violations of federal and state consumer credit laws. They asked for attorney fees and requested the trial court to quiet title in the McAdamses' name free of the mortgage upon payment to First Federal of the remaining amount due the Parnells under the land sale contract. First Federal then asked for a judgment against the Parnells for the amount due under the

mortgage and for mortgage foreclosure against the McAdamses. The McAdamses tendered to the clerk of the court the unpaid principal sum on the land contract, plus interest, in the sum of $6,248.69. The McAdamses also gave to First Federal notice of cancellation and rescission of loans made by First Federal to the Parnells.

The Parnells subsequently moved away from Indiana, and the trial court found it had no jurisdiction over their property except for the payment by the McAdamses into court of the final installment under the land sale contract.

The unpaid balance of the mortgage as of the first date of the two-day trial was $32,964.03, with daily interest accruing at $14.65 per day. After the trial, the trial court entered judgment for First Federal against the Parnells for the sum which the McAdamses deposited into court, and also ordered that the payment of that sum to First Federal would satisfy and release the lien which First Federal held on the McAdamses' property, which in effect denied foreclosure. The trial court also entered judgment for the McAdamses against Edwards Realtors and First Federal in the amount of $7,500 for attorney fees, plus costs of the action. Specific findings of fact and conclusions of law were made by the trial court at the request of the McAdamses. Both First Federal and Edwards Realtors appeal from the trial court's denial of their motions to correct errors.

## ISSUES

Edwards Realtors raises three issues, but we need address only the following two: [1]

1. Was the McAdamses' action barred by the statute of limitations?

2. Did the trial court err in awarding attorney fees?

First Federal adequately raises two issues, which we restate as:

___

**1.** Because we reverse as to the award of attorney fees, it is unnecessary for us to address the remaining issue raised by Edwards Realtors.

1. Did the trial court err in finding that First Federal violated various provisions of federal and state consumer credit laws?
2. Were the trial court's findings and conclusions, that First Federal's mortgage lien was subordinate to the McAdamses' interest in the property and that First Federal was entitled to only approximately $6,200 on its mortgage debt, contrary to law?

## DECISION

### A. ISSUES BETWEEN EDWARDS REALTORS AND THE McADAMSES

■ The McAdamses were denied leave by this court to file a brief in excess of fifty pages. They then chose to file a brief countering only those arguments presented by First Federal, and have presented no arguments in regard to Edwards Realtors. When no appellee's brief is filed, the appellant may prevail by a showing of prima facie reversible error. *Means v. Means* (1987), Ind.App., 511 N.E.2d 323.

### I.

ISSUE ONE—Was the McAdamses' action barred by the statute of limitations?

PARTY'S CONTENTION—Edwards Realtors labels the McAdamses' action as one in malpractice, which was barred by the McAdamses' failure to file their complaint within two years of the occurrence of the alleged breach of trust.

CONCLUSION—The McAdamses' action is not barred by the statute of limitations.

■ While arguably the action could be characterized as a malpractice action, the trial court specifically found that the action by the McAdamses against Edwards Realtors, "whether considered to be on account, for recovering possession of personal property, for relief against frauds, or for breach of trust, is not limited by any applicable statute of limitations." *Record* at 265. The McAdamses' complaint alleged that Taylor failed in his duty to make required payments from the trust funds.

*Record* at 24–26. The trial court specifically referred in its findings and conclusions to Taylor's role and duties as a trustee, and found that due to Taylor's misapplication of trust funds, Edwards Realtors should account to the McAdamses. *Record* at 265. We may not overturn the determinations of the trial court unless they are clearly erroneous, i.e., only if the evidence contains no facts or reasonable inferences to support those findings. *Wiseman v. Wolfe's Terre Haute Auto Auction, Inc.* (1984), Ind.App., 459 N.E.2d 736; Indiana Rules of Procedure, Trial Rule 52(A). Edwards Realtors has not disputed the trial court's findings that the action was based on a breach of trust, on account, or to recover personal property, and has thus failed to convince us that the findings are clearly erroneous. Whether the action is framed in terms of a suit on account, or for breach of a constructive trust, the applicable statute of limitations is six years. *See* Ind.Code 34–1–2–1 (1982). This action was brought within four years.

### II.

ISSUE TWO—Did the trial court err in awarding attorney fees against Edwards Realtors?

PARTY'S CONTENTION—The trial court erred in awarding attorney fees, Edwards Realtors contends, because Edwards Realtors did not enter into a contract with the McAdamses; no statute authorized the award; and no equitable grounds apply.

CONCLUSION—The trial court erred in awarding attorney fees against Edwards Realtors.

■ The only judgment awarded against Edwards Realtors was for the payment of attorneys fees and costs of the action. In Indiana, each party pays his own attorney fees absent a statute or rule to the contrary. *Dotlich v. Dotlich* (1985), Ind.App., 475 N.E.2d 331, *trans. denied.* This rule applies equally in courts of law and those in equity. *Kikkert v. Krumm* (1985), Ind., 474 N.E.2d 503. The only statutes on which the McAdamses might possibly rely, and they have not done so, are Ind.Code 30–4–3–11(b)(4) (1982) and IC 30–4–3–22(e)

which allow for reasonable attorney fees incurred in successfully maintaining a suit for breach of trust. However, IC 30–4–1–1(c) provides that the rules of law in that article (i.e., IC 30–4) do not apply to trusts created by statutes outside IC 30–4. Here, the trust relationship seems to stem from IC 25–34.1–4–5 (Supp.1987), which requires a broker to maintain a trust account, so the attorney fee award must rest on some other basis. There is no showing that an agreement existed between Edwards Realtors and the McAdamses allowing attorney fees. The three equitable exceptions to the general rule do not appear to apply in this case. *See Cox v. Ubik* (1981), Ind.App., 424 N.E.2d 127; *City of Indianapolis v. Central R.R. Co.* (1977), 175 Ind.App. 120, 369 N.E.2d 1109, *trans. denied.* We can only conclude that Edwards Realtors has made a prima facie showing on appeal that the award of attorney fees was inappropriate and should be reversed.

### B. ISSUES BETWEEN FIRST FEDERAL AND THE McADAMSES

First Federal's general argument that the McAdamses were not entitled to any recovery against them because no relationship existed between First Federal and the McAdamses is waived because First Federal failed to raise this argument at trial or in its motion to correct error. *See Carson v. Ross* (1987), Ind.App., 509 N.E.2d 239, *trans. denied.*

ISSUE ONE—Did the trial court err in finding that First Federal violated various provisions of federal and state consumer credit laws and awarding attorney fees based on the violation?

PARTIES' CONTENTIONS—The claim of First Federal essentially is that the McAdamses were not parties to the loan agreement between First Federal and the Parnells, were not extended any credit by First Federal, and that therefore First Federal owed them no disclosure or notice under state or federal consumer credit provisions. Additionally it argues that the Mc-

Adamses failed to exercise in a timely fashion their right of rescission.

The response is that they were "customers" entitled to protection under federal consumer laws, and "debtors" protected by Indiana's consumer credit provisions. They base their right to attorneys fee on the violations of these laws by First Federal. The McAdamses also counter that no time limit is applicable to their right to rescind.

CONCLUSION—The trial court erred in awarding the McAdamses attorneys fee based on a violation of State or Federal consumer protection laws.

The McAdamses ground their right to recover attorney fees on IC 24–4.5–5–202(8) (1982) which provides that "[i]n any case in which it is found that the creditor has violated this Article [Indiana's Uniform Consumer Credit Code], the court may award reasonable attorney's fees incurred by the debtor." We assume, as the McAdamses have not indicated to the contrary, that the alleged violations occurred in 1981 at the time the purchase agreement and contract for the sale of real estate were signed, when the modification agreement was signed, and when First Federal allegedly deferred payments by the Parnells. Our analysis therefore relies on the statutes and regulations as they existed in 1981.

The trial court erred in finding that First Federal owed the McAdamses certain disclosures and notice of the right of rescission under the Federal Truth In Lending Act (TILA)[2] and under Indiana's Uniform Consumer Credit Code (IUCCC).[3] The trial court found that First Federal failed under the consumer credit statutes to make required loan disclosures and notice of the right of rescission while maintaining the mortgage on the property, and also that First Federal failed to make required disclosures when deferring the Parnells' payments under the modification agreement.

---

**2.** 15 U.S.C. §§ 1601–1677 (1982).

**3.** IC 24–4.5–1–101 to –6–204.

The purpose of Indiana's consumer credit provisions are generally: to simplify the law regarding installment sales and consumer credit, to advance consumer understanding of credit transactions, to encourage consumer shopping for reasonable credit rates, to protect consumer buyers and borrowers against unfair practices, to encourage fair consumer credit practices, and to conform to the federal law on consumer transactions. *See* IC 24–4.5–1–102. The disclosure provisions under federal law are also intended to promote informed use of credit by consumers and to encourage them to shop for favorable credit terms. *Streit v. Fireside Chrysler–Plymouth, Inc.* (7th Cir.1983), 697 F.2d 193; *Dixey v. Idaho First Nat'l Bank* (9th Cir.1982), 677 F.2d 749; *see also* 15 U.S.C. § 1601.

Under IC 24–4.5–3–301 a lender was required to disclose to the *debtor* to whom credit was extended the information required by the TILA. As it read in 1981, IC 24–4.5–5–204 allowed the *debtor*, in certain circumstances, the right to rescind a consumer credit sale or consumer loan, and required the creditor to inform the debtor of this right. Additionally, IC 24–4.5–3–308 required a lender to make certain disclosures *to the debtor* when deferral of payment was made by the lender. The McAdamses therefore needed to demonstrate that they were debtors in order to prevail against First Federal.

The TILA offered similar protections to "obligors" in consumer credit transactions. *See* 15 U.S.C. § 1631 (disclosure) and § 1635 (right of rescission). Although the term "debtor" is not defined in the Indiana Act, the Federal Code defined "consumer" as used in reference to a credit transaction, as a transaction "in which the *party to whom credit is offered or extended* is a natural person, and the money, property, or services which are the subject of the transaction are primarily for personal, family, or household purposes." 15 U.S.C. § 1602(h) (emphasis supplied). "Credit" was defined as the "right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." 15 U.S.C. § 1602(e).

■ Under the Code of Federal Regulations (C.F.R.)[4] "customer" was defined as "(1) a cardholder or (2) a natural person to whom consumer credit is offered or to whom it will be extended, and includes a co-maker, endorser, guarantor, or surety for such natural person who is or may be obligated to repay the extension of consumer credit." 12 C.F.R. § 226.2(u) (1981). The McAdamses' argue that they were sureties and thus customers under the regulation's definition. A surety is one who agrees to fulfill the obligations of a principal in the event that the principal fails to comply with a contract. *See Indiana Univ. v. Indiana Bonding & Sur. Co.* (1981), Ind.App., 416 N.E.2d 1275, *trans. denied.* Thus, to be a surety, as included in the C.F.R.'s 1981 definition of "customer", one must obligate himself to repay the extension of consumer credit.[5]

■ Under the above definitions, we see the crucial inquiry in this case as whether the McAdamses were extended credit by First Federal, and thus incurred debt with an obligation to repay the debt. In this case, the McAdamses never agreed orally or in writing to repay the Parnells' debt. *See First Fed. Sav. & Loan Ass'n v. Treaster* (1986), Ind.App., 490 N.E.2d 1149, *trans. denied* (purchaser did not agree to assume mortgage and court would not go beyond what parties expressed in writings to find an assumption). Neither the purchase agreement nor the land sale contract mentioned First Federal's mortgage on the property. *See record* at 34, 42–45. Although paragraph 13 of the land sale contract allowed for the seller to "place or maintain a mortgage on said premises for

4. Pursuant to 15 U.S.C. § 1604, the Federal Reserve Board issued Regulation Z, 12 C.F.R. §§ 226.1–226.1002, which contained administrative regulations applicable to the TILA.

5. Under the regulations which became effective in 1982, the definition of "customer" was deleted and replaced with "consumer." *See* 12 C.F.R. § 226.2 (1982 ed.). This change has remained. As we view the regulations, "customer" and "consumer" have both been used to refer to the same party, i.e., the obligor in the consumer credit transaction.

an amount not in excess of the then unpaid balance of the sale price," *see record* at 43, there is no indication express or implied of an intention by the McAdamses to assume liability of the mortgage debt. *Cf. Hazifotis v. Citizens Fed. Sav. & Loan Ass'n* (1986), Ind.App., 505 N.E.2d 445 (Grantor of property remained liable on debt when evidence failed to show that grantee assumed the mortgage and when parties understood there was no assumption). By contracting to buy the property merely "subject to" First Federal's mortgage, the McAdams did not become personally liable on the mortgage debt. *See Cook v. American States Ins. Co.* (1971), 150 Ind.App. 88, 275 N.E.2d 832 (quoting *Hancock v. Fleming* (1885), 103 Ind. 533, 3 N.E. 254); *Kinney v. Heuring* (1909), 44 Ind.App. 590, 87 N.E. 1053.

Thus, we can only conclude from the record before us that the McAdamses did not have the requisite relationship as debtors with First Federal to justify an award of attorneys fees.[6]

We are not without authority to support our position. *Cf. Dryden v. Lou Budke's Arrow Fin. Co.* (8th Cir.1980), 630 F.2d 641 (court found that plaintiff was entitled to protection under TILA because after *assuming* a car loan, he became a "customer" by incurring debt and deferring payment); *Berryhill v. Rich Plan of Pensacola* (5th Cir.1978), 578 F.2d 1092 (husband and wife were "borrowers" under TILA to whom disclosures were due when both were *jointly and severally liable* for debt); *Kendrick v. Jim Walter Homes, Inc.* (S.D. Ind.1981), 545 F.Supp 541 (term "debtor" means an individual who *incurs* obligations in consumer credit transactions); *Weiner v. Bank of King of Prussia* (E.D.Pa.1973), 358 F.Supp. 684 (bank could not be obligated to disclose credit terms to individual who was not a borrower or doing business with the bank because the TILA explicitly provides that only a person to whom a duty is owed can recover for breach of the duty);

*Dicus v. Ripley County Bank* (1984), Ind. App., 471 N.E.2d 1257, *trans. denied* (court commented that plaintiff, whose husband had executed a mortgage to bank, was not a party to any of the loans and thus not entitled to disclosure under the TILA, and also that plaintiff failed to demonstrate how she as subsequent transferee was entitled to disclosures); *Anderson v. Wagner* (1980), 207 Neb. 87, 296 N.W.2d 455 (creditor's duty to disclose relates only to his obligor under the TILA and, because plaintiffs were not people to whom credit was given, the TILA did not apply to them).

As the trial court improperly found that First Federal violated the TILA and the IUCCC, the trial court's award of attorneys fees cannot be upheld on that basis. No other basis is presented by the McAdamses on which to sustain the award. Applying the general rule regarding attorney fees, *see Dotlich, supra,* the award of attorney fees against First Federal which is not based on a statute, contract, or rule cannot stand.

ISSUE TWO—Were the trial court's findings and conclusions, that First Federal's mortgage lien was subordinate to the McAdamses' interest in the property and that First Federal was entitled to only approximately $6,200 on the mortgage debt, contrary to law?

PARTIES' CONTENTIONS—First Federal summarily argues that it was entitled by IC 34-1-53-1 (1982) to judgment on an order of foreclosure, and that the trial court's findings and conclusions were unsupported and contrary to the law and the facts.

The response is that the McAdamses' interest in the property is superior to that of First Federal because First Federal impaired the McAdamses' interest as junior mortgagee or surety, and acted in reckless disregard of their interest by not requiring the Parnells to make regular monthly payments.

---

6. We recognize that if this same transaction had taken place more recently our analysis might be otherwise. Although the definition of "consumer" was generally narrowed in 1982, for the purpose of the rescission rules, "consumer" was given a broad definition. *See* 12 C.F.R § 226.2(a)(11), § 226.15, and § 226.23 (1982 ed.); *see also* 12 C.F.R., Supp. I, Subpart A, § 226.2(a)(11) (1982 ed.) and reference notes following.

CONCLUSION—The trial court's findings and conclusions regarding First Federal's right to foreclose were contrary to law.

 Upon default in the performance of any condition in a mortgage, the mortgagee may proceed in the court of the county where the land is located to foreclose the mortgage. IC 34–1–53–1 (1982). Foreclosure is strictly within the equitable discretion of the trial court. *Smith v. Federal Land Bank of Louisville* (1985), Ind. App., 472 N.E.2d 1298. Here, the trial court refused to allow foreclosure by First Federal in the amount of $34,328 plus interest because of the alleged violations of consumer credit provisions, and because the mortgage was unconscionable and inferior to the McAdamses' interest in the property.

 As explained above, the McAdamses were not protected in this situation by consumer credit laws. They never assumed the mortgage and therefore did not become personally liable on the debt; rather they took the property merely subject to the debt. *See Cook, supra.* When a party purchases property subject to a mortgage, he takes the land charged with the payment of the debt, *id.,* and the land becomes the primary source of payment of the mortgage debt. *First Fed. Savs. & Loan Ass'n v. Arena* (1980), Ind.App., 406 N.E.2d 1279.

"Mortgagors commonly transfer real estate 'subject' to an existing mortgage. This language goes beyond its apparent meaning that the land in the hands of the transferee can be reached by the mortgagee on default in priority to any right of the former in it. This is always true regardless of any agreement by the parties. What it means in this connection is that the transferee agrees, as between him and his transferor, that the debt is to be satisfied out of the land. Or, as it is frequently put, the land is the principal and the transferor is only in the position of a surety or one secondarily liable."

G. Osborne, G. Nelson & D. Whitman, *Real Estate Finance Law* § 5.3 at 251 (2d ed. 1979).

Based on the basic rule of law set forth above, the trial court's finding that First Federal's lien is inferior and subordinate to the McAdamses' interest in the land cannot be upheld. As the McAdamses were not junior mortgagees in regard to the property, their argument that First Federal, as senior mortgagee, could not impair their interest is unpersuasive. Likewise, *Arena, supra,* does not aid the McAdamses, because the McAdamses did not assume the position of a surety.

 An equitable estoppel theory would take into account the McAdamses' argument that First Federal impaired their interest by not requiring regular monthly payments, and could act to estop First Federal from its right to foreclose against the property. *See Glaser v. Indiana State Dep't of Pub. Welfare* (1987), Ind.App., 512 N.E.2d 1128, *trans. denied* (elements of estoppel). The trial court did find that First Federal approved the sale of the property to the McAdamses and received a copy of the contract. *Record* at 263. It also found that the Parnells made no payments under the modification agreement until April 1, 1983 when the first payment was due in July of 1981. *Record* at 263. However, the trial court failed to find specifically that Walter had inquired regarding the status of the loan at First Federal, that First Federal refused to disclose the amount of the mortgage debt, that First Federal informed Walter that the Parnells were current on their loan, or that the McAdamses continued to make payments until they learned of the Parnells' failure to pay off their debt. Had these findings been present, an equitable estoppel theory might have affected the availability of the foreclosure remedy for First Federal. Nevertheless, when a trial court is required to make special findings of fact as it was here due to the McAdamses' request, this court may not add to those findings by presumption or inference. *Indiana & Michigan Elec. Co. v. Terre Haute Indus., Inc.* (1987), Ind.App., 507 N.E.2d 588; T.R. 52(D). Based on the trial court's findings and conclusions before us, we are compelled to conclude that First Federal was entitled to foreclose on the mortgage.

As First Federal did not violate any consumer credit provisions, and because the trial court erred in finding that First Federal's interest was inferior to that of the McAdamses, the trial court's findings and conclusions were contrary to law.

The trial court's judgment is reversed and remanded, with instructions for the trial court to direct an order of foreclosure.

GARRARD, P.J., concurs.

SULLIVAN, J., concurs with separate opinion.

SULLIVAN, Judge, concurring.

I concur in the majority opinion except with the implication that an issue of equitable estoppel existed in this litigation at the trial level or exists before us upon appeal.

That First Federal, as stated by the majority at page 1253 of the opinion, may have waived its argument that no relationship existed between it and the McAdamses, does not establish the existence of any relationship. Some sort of relationship would be essential to the creation of a duty by First Federal to advise McAdamses of the Modification Agreement with Parnells and/or that Parnells were not making payments pursuant to that modification.

With or without regard to the existence of any such relationship, I find no evidence of record which permits an inference that First Federal did or said anything with the intention that the McAdamses rely thereon, nor do I find any evidence that the McAdamses were induced to act or not act as a result of the conduct of First Federal. In short, there is nothing of record to indicate that the McAdamses relied upon any act or statement of First Federal or that if they did so, they had a right to so rely. To the contrary, the evidence discloses that McAdamses knew that the mortgage balance exceeded the balance due on their contract with the Parnells. Accordingly, the McAdamses cannot reasonably claim that reliance upon First Federal led to their damage.

This case is a classic foreclosure situation. The contract purchasers took an interest in the real estate subject to the existing mortgage held by First Federal and the land remained the primary source for the unpaid portion of the debt. First Federal is entitled to foreclose against the real estate.

For this reason I concur in the reversal of the judgment and in the order directing foreclosure against McAdamses' interest in the real estate.